Filed 10/25/24  P. v. Herena CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H042741 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. C1359109) |
| v. | |
| ABEL JOSEPH HERENA et al., | |
| Defendants and Appellants. | |

Defendants Abel Joseph Herena, Aaron Jovani Lomeli, and Juan Valdovinos Cruz were leaving the Fairways Apartments with friends when they encountered Phillip Ayala, Alex Rodriguez, and Andres Rodriguez[1] arriving in the parking lot.  Confronted by Ayala, Lomeli responded by saying, "Pull it out," and Herena drew his gun.  Backing toward the street as the conflict escalated, Herena eventually fired 10 times, killing both Ayala and Rodriguez and wounding Lomeli's companion, Shanyka Perez.  Cruz, also armed, fired twice.

At the conclusion of a 10-month trial on murder and related charges, the court instructed the jury on theories of liability that the Legislature has since eliminated or narrowed:  (1) murder as the natural and probable consequence of either (a) aiding and

---

[1] Because Andres shares the same surname as victim Alex Rodriguez, we refer to Andres by his first name for clarity.

abetting assault with a firearm or (b) conspiring to commit such an assault, and (2) participation in a criminal street gang by acting for its common reputational benefit. Relying on those instructions, the prosecution argued among other theories that (1) the fatal shooting was the "inevitable" consequence of the defendants' "walk[ing] out into that parking lot" as armed gang members, (2) the reflection necessary to premeditation and deliberation began with each defendant's decision to "go out into [their] gang territory with two other gang members and loaded guns," and (3) the shooting "enhanc[ed] [the gang's] reputation" by demonstrating that its members were "ruthless" and "violent" enough to be "respected."  The jury convicted the defendants of the murders, assault, firearm and gang offenses, finding true applicable firearm, injury, and gang enhancements and (as to Lomeli and Herena) a multiple-murder special circumstance.

Before the close of briefing in this appeal, the Legislature amended Penal Code sections 188, 189, and 186.22[2] to abrogate the natural and probable consequences doctrine and require that the common benefit necessary to a gang offense or enhancement be more than reputational.  (See Sen. Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill No. 1437); Assem. Bill No. 333 (2021–2022 Reg. Sess.) (Assembly Bill No. 333).)  The defendants seek reversal based on these legislative developments, as well as on their original assignments of error (instructional error, insufficiency of the evidence, and sentencing error in the imposition of enhancements, fines, fees, and restitution).

As to all defendants, we will reverse the gang convictions and gang enhancements; as to Lomeli and Cruz, we will reverse the murder convictions; as to all other offenses of conviction, we affirm; and our remand makes it unnecessary to reach their sentencing claims.

---

[2] Unspecified statutory references are to the Penal Code.

# I. BACKGROUND

## A. *The Charges*

In the operative information, the Santa Clara County District Attorney charged Cruz, Herena, and Lomeli jointly with the murder of Ayala and Rodriguez (§ 187, subd. (a); counts 1 & 2), assault with a semiautomatic firearm on Perez (§ 245, subd. (b); count 3), and three counts of participating in a criminal street gang (§ 186.22, subd. (a); counts 7, 8, & 9). Herena and Lomeli were separately charged with owning, purchasing, receiving, and possessing a firearm by a felon (§ 29800, subd. (a)(1); counts 4 (Herena) & 5 (Lomeli)). Cruz was separately charged with carrying a loaded firearm on his person or in a vehicle when he was not the registered owner. (§ 25850, subd. (a); count 6).)

As to each count, it was alleged that all three defendants committed the offenses for the benefit of, at the direction of, and in association with a criminal street gang. (§ 186.22, subd. (b)(1).)

As to counts 1 and 2, it was alleged that Herena and Cruz personally and intentionally discharged a semiautomatic firearm and proximately caused great bodily injury and death (§ 12022.53, subd. (d)), that Cruz and Lomeli were principals in the offenses charged and at least one principal intentionally and personally discharged a semiautomatic firearm that proximately caused great bodily injury or death (§ 12022.53, subds. (d) & (e)(1)), and that in the proceeding, each of the defendants had been convicted of more than one offense of murder in the first or second degree (§ 190.2, subd. (a)(3)).

As to count 3, it was alleged that Herena and Cruz personally used a semiautomatic firearm (§ 12022.5, subd. (a)) and personally inflicted great bodily injury (§§12022.7, subd. (a), 1203, subd. (e)(3)).

As to counts 7, 8, and 9, it was alleged that Herena and Cruz personally used a semiautomatic firearm (§ 12022.5, subd. (a)).

3

Finally, the information alleged that Herena had a prior felony conviction within the meaning of section 667.5, subdivision (b).

**B.    *The Prosecution's Case***

The prosecution's theory of the case was that the night of the shooting, Herena, Cruz, and Lomeli were members or recruits of a violent Norteño street gang, El Hoyo Palmas (EHP), murder was the unavoidable consequence of the group going out together while armed, and they murdered Ayala for disrespecting Lomeli, killing Rodriguez and injuring Perez in the process.

**1.    *The Crime Scene and Forensic Evidence***

The Fairways Apartments complex on San Antonio Court in San Jose has a driveway that proceeds past seven parking spots alongside the complex to an underground parking lot. Ayala and Rodriguez were found dead in the driveway at the rear of the cars parked closest to San Antonio Court. Perez, wounded in the leg, was found between two of those parked cars.

Ayala had been killed by a .22-caliber bullet to the head and had a secondary gunshot wound to his right thigh and hip area from a .32-caliber bullet. It was unclear whether the .22-caliber head wound preceded the .32-caliber leg wound. A .22-caliber bullet had dissected Rodriguez's aorta, killing him in minutes, and a later .32-caliber gunshot struck his abdomen. (It was not apparent that his abdominal injuries would have been fatal.) DNA evidence indicated that a .22-caliber bullet later recovered from the scene was what struck Perez in the thigh.

Ten .22-caliber shell casings, each bearing the same headstamp, were recovered from locations extending from the Fairways-side curb of San Antonio Court and across the roadway to the opposite corner where San Antonio Court bends into another street. Two .32-caliber casings were found between the two cars parked in the driveway closest to the street.

4

The location of the casings led the prosecution criminalist to conclude that there had been two shooters: The shooter with the .22-caliber weapon was moving when firing, from the front of the driveway and across San Antonio Court, and the second shooter was either between or just to the rear of the cars parked in the driveway closer to the sidewalk.

### 2. *Events Leading to the Shootings*

Ayala and Rodriguez spent their last evening drinking with their friend Andres at an Applebee's restaurant. Ayala was drunk, irate, and convinced other customers were "mugging" him. After Ayala got angry with another patron in the men's room, the three friends left for the Fairways Apartments in San Jose, where Ayala had been staying.

After parking at the apartment complex, Ayala, Rodriguez, and Andres encountered Lomeli, Herena, Cruz, and Perez. Lomeli, Herena, and Cruz had spent the evening at the apartment complex with Perez, who lived there, and were leaving the building with Perez and Ruben Lopez. There was no evidence that the two groups knew each other, but Perez thought Ayala was "mean-mugging" her and Lomeli, so she warned Lomeli that perhaps the car he was then leaning against might be Ayala's. When Lomeli apologized to Ayala, Ayala started yelling.

On hearing Lomeli say that he was tired of Ayala's disrespect, Andres began to fear the two would fight. Ayala "looked like he just wanted to fight" and answered, "What's up? What's up?" So Andres urged Ayala to take him to the apartment, trying but failing to push Ayala away from Lomeli. When Lomeli told his companions, "Pull it out," Herena pulled out a gun and pointed it in the air. Perez, who denied seeing a gun, testified that as Herena and Cruz backed away toward the street, Ayala and his companions advanced towards them. Although Andres had told the police that Herena had been backing up with the gun for at least 10 seconds, Andres at trial described Herena as "dancing around" and "bouncing around like a monkey," "back and forth," for

5

" 'about ten seconds' " while holding the gun in the air. Rodriguez then told Andres, "Go get the whip," which Andres understood to mean he should go fetch their car.

Andres at trial did not recall hearing shots but saw Herena run to an approaching van, which then drove off with him. Rodriguez was still breathing at that point, but Ayala was not. Andres heard a woman screaming: Perez had heard the gunfire but was shot before she could get away.

Herena's trial counsel conceded that Herena was the shooter of the .22-caliber gun and fired it 10 times.

### 3. *Gang Evidence*

The prosecution presented many witnesses over many days on the gang affiliation of the three defendants—general testimony about the EHP subset and the Norteño criminal street gang and particularized testimony about various gang kites (messages passed between gang members in custody), the defendants' association with each other and with other gang members, and criminal acts perpetrated by people associated with EHP. No evidence was presented to suggest that Ayala or his companions were gang members.

The prosecution presented expert testimony from district attorney investigator Michael Whittington that the three defendants were EHP members, that EHP members will know if fellow gang members are carrying a gun, and that EHP members will retaliate against disrespect.[3] Whittington testified that disrespect to a gang member, however slight, can result in violence. According to Whittington: (1) gang members expect each other to punish perceived disrespect, including with deadly force; (2) a gang member receiving a dirty look who then says, "[p]ull it out" will expect fellow gang

_____

[3] Whittington opined that Ruben Lopez, who was with the defendants that evening, was also a gang member in August 2010, though Whittington did not specify which Norteño gang he was affiliated with.

6

members to obey and draw a gun or other weapon; and (3) gang members know when fellow gang members are armed, to be prepared to meet an assault, an incursion by rivals, or another situation requiring lethal force.

To prove that EHP met the then-operative definition of a criminal street gang, Whittington testified about the following crimes that demonstrated its members engaged in a pattern of criminal activity:

(1) In June 2009, an officer surveilled a car occupied by four suspected EHP members. Found in the car were a nine-millimeter handgun and a .22-caliber rifle with a destroyed serial number, as well as other weapons such as a hammer. The parties stipulated that three individuals were each convicted of violating section 12031, subdivision (a)(1), carrying a loaded firearm on a person or in a vehicle, with a gang enhancement under section 186.22, subdivision (b).

(2) In May 2008, police responding to a shooting found one victim dead at the scene and another with a gunshot wound to the leg. The investigation revealed that a woman in the area had felt disrespected by local Sureño gang members, so she summoned a "33rd Street/EHP member"[4] and an EHP member. When the two men arrived, one of the men pulled out a gun, chased the Sureños, and fired at them. The parties stipulated that one of the men was convicted of murder (§ 187) and attempted murder (§§ 664, 187), along with a gang enhancement (§ 186.22, subd. (b)).

(3) In November 2007, an EHP member approached a group standing in front of a 7-Eleven store and accused them of being "fucking scraps." One of the group tried to calm the EHP member, but the EHP member stabbed the person in the neck. The parties stipulated that the EHP member was convicted of attempted murder (§§ 664, 187) with a gang enhancement (§ 186.22, subd. (b)).

---

[4] Whittington described 33rd Street as a Norteño subset loyal to EHP; members of 33rd Street may "move up" to EHP if not expelled before making it to the "major league."

7

(4) In March 2007, a San Jose Police Department's SWAT team surveilling the EHP gang saw three EHP members shoot a locksmith who had been called to respond to an emergency that night. The parties stipulated that the three men were each convicted of murder (§ 187) with a gang enhancement (§ 186.22, subd. (b)).

Finally, the prosecution also presented evidence of Lomeli's prior juvenile adjudication for assault by force likely to produce great bodily injury (§ 245, subd. (a)(1)) from an incident in August 2008 where he was seen chasing a man with a hammer.

## C.     *The Defenses*

Herena argued that he fired in self-defense, afraid of Ayala, having retreated to the street before doing so. He also argued that he was "shooting and moving" without intending to strike anyone.

Lomeli argued that it was Ayala and his group who were the aggressors, while Lomeli was himself unarmed. Lomeli disputed the evidence that he said, "Pull it out," and argued that the directive, even if made, would have been a "defensive request" that his companions deter the aggressors by brandishing a weapon.

Cruz, who testified, denied having had or fired a gun and maintained that he began to flee before even hearing gunshots. Cruz said that he became concerned for Perez's safety when he saw Lomeli and Perez arguing with Ayala in the parking lot. Ayala raised his voice several times and looked like he was raising his shirt and pants in a way that made Cruz fear Ayala was reaching for a weapon. Cruz heard Herena say, loudly, "We don't want none, bro." Believing he was in danger, Cruz ran. He heard no one say, "Pull it out" or a comparable directive. Cruz posited that Herena was the lone shooter, armed with both the .32- and the .22-caliber guns.

Supporting Cruz's lone-gunman defense, forensic bloodstain pattern analyst Kenton S. Wong opined that the firearms evidence could be consistent with one person initially firing the .32-caliber gun, moving to the street, and then firing the .22-caliber gun.

8

The defense also presented their own gang expert, Mark Harrison, who disputed Whittington's opinion that the crimes were committed for the gang's benefit. Harrison saw no evidence of anyone confronting gang rivals. Harrison also opined that respect is not a necessary aspect of gang culture, and he did not see evidence of respect playing a role in this case. Presented with a hypothetical that tracked the facts of the case, Harrison opined that there was no expectation that the other two gang members would follow another gang member's instruction to "[p]ull it out." Harrison believed there was insufficient detail to support an inference that one gang member would know that the other two gang members were armed.

**D.**     *The Verdicts and Sentencing*

In January 2015, the jury found both Herena and Lomeli guilty of two counts of first degree murder; the jury found Cruz guilty of two counts of the lesser offense of second degree murder (counts 1 & 2). The jury convicted the defendants of all other counts and found true all the allegations and enhancements, except for the multiple-murder special circumstance (§ 190.2, subd. (a)(3)) as to Cruz. In a bifurcated proceeding, the trial court found true the allegation that Herena had served a prior prison term.

In June 2015, the trial court in part sentenced both Lomeli and Herena to two consecutive terms of life without possibility of parole for the two murder convictions, plus indeterminate and consecutive determinate terms for enhancements and subordinate terms. The court sentenced Cruz to 15 years to life for each of his two murder convictions, a consecutive indeterminate term of 25 years to life for the firearm enhancement, and a consecutive determinate term of 29 years for assorted enhancements and lesser offenses. Defendants timely appealed.

9

## II.    DISCUSSION

### A.    *The Effect of New Legislation*

In the years since the trial in this case, the Legislature has narrowed the reach of the murder statutes under which the defendants were convicted and the gang statutes that both aggravated their offenses and enabled the admission of prior acts as evidence the prosecution relied on to argue their propensity for lethal violence.  In passing Senate Bill No. 1437, the Legislature amended the murder statutes " 'to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant . . . who acted with reckless indifference to human life.' " (*People v. Lewis* (2021) 11 Cal.5th 952, 959; Stats. 2018, ch. 1015, § 1, subd. (f), p. 6674.)  In passing Assembly Bill No. 333, the Legislature narrowed what constitutes a "criminal street gang," a "pattern" of gang activity, and gang "benefit" under section 186.22, thereby " 'increas[ing] the threshold for conviction of the section 186.22 offense and the imposition of the [gang sentencing] enhancement,' " to the obvious benefit of the defendants here.  (*People v. Tran* (2022) 13 Cal.5th 1169, 1207 (*Tran*).)[5] The Attorney General appropriately concedes that both ameliorative changes apply retroactively to all three defendants under *Estrada*, *supra*, 63 Cal.2d 740 but argues that the application of former law was harmless beyond a reasonable doubt under *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*).

---

[5]Assembly Bill No. 333 also added section 1109 (Stats. 2021, ch. 699, § 5, p. 8869), which now requires bifurcation of a substantive gang offense or gang enhancement upon a defendant's request.  The California Supreme Court recently decided in *People v. Burgos* (2024) 16 Cal.5th 1 that section 1109 is not retroactive under *In re Estrada* (1965) 63 Cal.2d 740 (*Estrada)*.  We therefore reject defendants' claims that the trial court's denial of Lomeli's motion to bifurcate the gang enhancements now warrants reversal under section 1109.

These ameliorative changes require us to vacate the gang enhancements and substantive gang offenses and to reverse Lomeli's and Cruz's convictions for first degree and second degree murder, respectively.

**1.** ***Amended Section 186.22***

At the time of defendants' trial, a "criminal street gang" was defined as "any ongoing organization, association, or group of three or more persons . . . whose members *individually or collectively* engage in, or have engaged in, a pattern of criminal gang activity." (Former § 186.22, subd. (f), italics added.) Effective January 1, 2022, Assembly Bill No. 333 changed the definition of a criminal street gang to require "an ongoing, *organized* association or group of three or more persons . . . whose members *collectively* engage in or have engaged in, a pattern of criminal gang activity." (§ 186.22, subd. (f), italics added.) Assembly Bill No. 333 also made five changes to the definition of a pattern of criminal gang activity: "First, the predicate offenses now must have been committed by two or more 'members' of the gang (as opposed to any persons). (§ 186.22, subd. (e)(1).) Second, the predicate offenses must be proven to have '*commonly* benefited a criminal street gang.' (*Ibid.*, italics added.) Third, the last predicate offense must have occurred within three years of the date of the currently charged offense. (*Ibid.*) Fourth, the list of qualifying predicate offenses has been reduced. (*Ibid.*) And fifth, the currently charged offense no longer counts as a predicate offense. (§ 186.22, subd. (e)(2).)" (*People v. E.H.* (2022) 75 Cal.App.5th 467, 477 (*E.H.*).)

Finally, Assembly Bill No. 333 amended the statute such that the prosecution is now required to prove that the benefit the gang derives from the predicate and current offenses is "more than reputational." (§ 186.22, subd. (g).) Section 186.22, subdivision (g) specifies that "[e]xamples of a common benefit that are more than reputational may include, but are not limited to, financial gain or motivation, retaliation,

11

targeting a perceived or actual gang rival, or intimidation or silencing of a potential current or previous witness or informant."

These substantive changes to the elemental definition of a criminal street gang "implicates the defendant's right to a jury trial under the Sixth Amendment, and reversal is required unless 'it appears beyond a reasonable doubt' that the jury verdict would have been the same in the absence of the error." (*Tran*, *supra*, 13 Cal.5th at p. 1207.) The Attorney General argues, however, that "[n]o rational jury would fail to find that the . . . evidence established a pattern of criminal gang activity as now defined."

We disagree. Under the amended version of section 186.22, the prosecution is now required to prove that the benefit the gang derives from not only the currently charged offenses but also the predicate offenses is "more than reputational." (§ 186.22, subd. (g).) We are unable to conclude beyond a reasonable doubt that the jury's verdict as to the gang-related charges would have been the same on this record had the amended version of section 186.22 been in effect. This is because the prosecution and its gang expert relied so extensively on the reputational benefit to the gang.

At trial, Whittington testified as to facts underlying four specific predicate offenses, which he opined were for the gang's benefit: (1) a June 2009 incident where two reputed EHP members and a Norteño were later convicted of carrying a loaded firearm for the benefit of a criminal street gang; (2) a shooting in May 2008, where a reputed EHP member was later convicted of murder and attempted murder with a gang enhancement; (3) a stabbing in November 2007 where a reputed EHP member was later convicted of attempted murder with a gang enhancement; and (4) a shooting in March 2007 where three reputed EHP or 33rd Street members were convicted of murder with a gang enhancement.[6]

---

[6] The parties stipulated to the convictions for the predicate offenses but not to the facts of the offenses themselves. After the trial in this case, the California Supreme Court

12

But Whittington's testimony relayed only that the predicate crimes were committed for the gang's benefit under the now-abrogated definition of predicate offenses set forth under the version of section 186.22 in effect at the time of trial (i.e., that the crime was "done for the benefit of, in association with a criminal street gang known as 'EHP' "), not the now-valid version enacted by Assembly Bill No. 333, which requires that the predicate offenses must have "commonly benefited" a criminal street gang in a way that is "more than reputational." (§ 186.22, subd. (e)(1).) For example, as to the stabbing offense, Whittington agreed when asked if the crime related to issues such as "respect within the relevant community, whether it be the gang community or the law-abiding community and respect through fear and violence."

Likewise, Whittington's testimony at trial on the currently charged offenses focused largely on the reputational benefit conferred to the gang from acts of violence. Whittington testified that committing violence enhances both a gang's and an individual gang member's reputation. He also equated violence with respect, explaining that violence was the glue that binds the gang together. Whittington's theory that reputational benefit motivated the killings aligned with the prosecutor's theory that Lomeli's belief that he was being disrespected instigated the crimes. Although punishing perceived

---

held in *People v. Sanchez* (2016) 63 Cal.4th 665 that the Confrontation Clause prohibited a gang expert from "supply[ing] case-specific facts about which he has no personal knowledge." (*Id.* at p. 676.) An expert cannot "relate as true case-specific facts asserted in hearsay statements, unless they are independently proven by competent evidence or are covered by a hearsay exception." (*Id.* at p. 686.) "[T]he particular facts offered to prove predicate offenses as required by [section 186.22] are not the sort of background hearsay information about which an expert may testify." (*People v. Valencia* (2021) 11 Cal.5th 818, 839 (*Valencia*).) But "[a] gang expert may testify about case-specific facts that he has personal knowledge of without violating the confrontation clause." (*People v. Garcia* (2020) 46 Cal.App.5th 123, 178.) Here, the extent to which Whittington's account of these offenses was based on his personal knowledge or on inadmissible hearsay is unclear. But our retroactive application of section 186.22, as amended by Assembly Bill No. 333 makes it unnecessary to resolve the defendants' *Sanchez*/*Valencia* claims.

disrespect may explain Lomeli's motive for allegedly instigating the murder, such a theory does not eliminate reasonable doubt as to whether a jury instructed under section 186.22 could rationally resist a finding that the crime was committed to "promote, further, or assist in criminal conduct by gang members" (under subdivision (b)(1)) or that the "common benefit is more than reputational" (under subdivision (g)).

The Attorney General argues against reversal on the theory that the reputational benefit of the killings here was "retaliation for [Ayala's] direct act of disrespecting an EHP member" and that "[r]etaliation is listed as an example of a common benefit that is more than reputational under the new law." But section 186.22, subdivision (g) as amended does not provide that all retaliation—for whatever slight or misdeed—is conclusively of more than reputational benefit; it provides that examples of "more than reputational" common benefit "*may* include . . . retaliation." (Italics added.) The existence of a more than reputational common benefit under current law thus remains a question of fact. And a rational jury could properly find on this record that labelling the reputational benefit of which Whittington repeatedly spoke as "retaliation for disrespect" did not change the merely reputational nature of the retaliation's benefit. This seems particularly likely here, when there was no evidence that Ayala or Rodriguez belonged to a rival gang competing with EHP in its primary activities.

We therefore cannot determine beyond a reasonable doubt that the jury's verdicts on the gang enhancements and substantive gang offenses were not premised impermissibly on the reputational benefit derived from the gang or that the jury did not rely on an invalid theory of reputational benefit underlying the predicate offenses. The gang enhancements and the substantive gang convictions must be vacated, and the matter must be remanded to permit the prosecution the opportunity for a retrial. (*People v. Sek* (2022) 74 Cal.App.5th 657, 674; *E.H.*, *supra*, 75 Cal.App.5th at p. 480.)

14

## 2. *Senate Bill No. 1437*

We next turn to the validity of the defendants' murder convictions under current law.  Effective January 1, 2019, the Legislature passed Senate Bill No. 1437, which among other things amended section 188, subdivision (a) to "eliminate[] natural and probable consequences liability for first and second degree murder." (*People v. Gentile* (2020) 10 Cal.5th 830, 849 (*Gentile*), abrogated by statute on other grounds as stated in *People v. Wilson* (2023) 14 Cal.5th 839, 869; Stats. 2018, ch. 1015, § 1, subd. (f), p. 6674.)  The Legislature later added section 1172.6, subdivision (g), which authorizes defendants to challenge on direct appeal the validity of a murder conviction under section 188 as amended.  (Stats. 2021, ch. 551, § 2, subd. (g), p. 6972.)  The Attorney General appropriately concedes that the jury here was instructed on invalid theories of murder, in addition to the still-valid theories of liability as a direct perpetrator, a direct aider and abettor of murder, or a member of a conspiracy to commit murder.

The now-invalid natural and probable consequences doctrine was incorporated in both the instructions on aiding and abetting as well as the instructions on conspiracy.[7]  To find a defendant liable under an aider/abettor theory for murder as the natural and probable consequence of a lesser target offense, the jury was instructed that the People must prove that "[t]he defendant is guilty of an assault with a firearm," "a coparticipant in the assault with a firearm committed the crime of murder," and the "murder was a natural and probable consequence of commission of assault with a firearm."  To find a defendant liable for murder under an uncharged conspiracy theory, the jury was instructed that a defendant is guilty of murder if (1) he conspired to commit murder, assault with a firearm, and/or carrying a loaded firearm in public, (2) a member of the conspiracy committed murder in furtherance of the conspiracy, and (3) murder was a natural and

---

[7] The trial court also instructed on the still-valid theories of directly aiding and abetting murder and conspiring to commit murder.

15

probable consequences of the common plan or design of the conspiracy. As to first degree murder, the trial court did not instruct the jury consistently with *People v. Chiu* (2014) 59 Cal.4th 155 (*Chiu*), in which the California Supreme Court held that a defendant cannot be convicted of first degree premeditated murder under the natural and probable consequences doctrine. (*Id.* at pp. 165–167; see also *People v. Rivera* (2015) 234 Cal.App.4th 1350, 1354 [reversing first degree murder conviction "because the instructions impermissibly allowed the jury to find [defendant] guilty of first degree murder if it found the target crime . . . was discharging a firearm at an occupied vehicle and that first degree murder was a natural and probable consequence of that target crime"].) Rather, the trial court instructed that the jury could find an accomplice or coconspirator guilty of first degree murder under a natural and probable consequence theory and that it need not be unanimous as to the particular theory of murder liability to find the murder to be of the first degree.

The prosecution having proceeded under alternative theories of liability that included the now-invalid natural and probable consequences doctrine (*Gentile*, *supra*, 10 Cal.5th at p. 849), it is undisputed that "a federal constitutional error has occurred." (*In re Lopez* (2023) 14 Cal.5th 562, 580 (*Lopez*).) What the parties dispute is whether the error was prejudicial.

Alternative-theory error requires reversal unless the Attorney General demonstrates that the error was harmless beyond a reasonable doubt under the standard set forth in *Chapman*, *supra*, 386 U.S. 18, 24. (*Lopez*, *supra*, 14 Cal.5th at p. 580.) Reversal is required " ' "unless the reviewing court concludes beyond a reasonable doubt that the error did not contribute to the verdict." ' " (*In re Ferrell* (2023) 14 Cal.5th 593, 602 (*Ferrell*).) Under this exacting standard, "we do not view the evidence supporting the valid theory in the light most favorable to the prosecution, but instead consider whether a reasonable jury, given the findings actually made and the state of the evidence, could have found in favor of the defendant." (*Id*. at pp. 604–605.) It is not enough that

16

substantial evidence would support conviction under current law or that a properly instructed reasonable jury would likely return a guilty verdict: Alternative-theory error "requires a court to rigorously review the evidence to determine whether any rational juror who found the defendant guilty based on an invalid theory, and made the factual findings reflected in the jury's verdict, would *necessarily* have found the defendant guilty based on a valid theory as well." (*Lopez*, at p. 568, italics added.)

Here, we find that the alternative-theory error was prejudicial as to both Lomeli and Cruz but harmless as to Herena.

### a. *Lomeli*

As there was no evidence that Lomeli was himself armed, and the prosecution's theory was that only Cruz and Herena were the shooters, no rational jury could have convicted Lomeli as a direct perpetrator. We therefore consider whether a reasonable jury instructed only on the remaining valid theories of directly aiding and abetting first degree murder or conspiring to commit murder could have entertained a reasonable doubt as to Lomeli's guilt for first degree murder. If so, the error of instructing the jury that he could be liable for murder as the natural and probable consequence of a lesser target offense or conspiracy was not harmless beyond a reasonable doubt, and we must reverse.

As is well established, "[i]n every crime . . . there must exist a union, or joint operation of act and intent . . . ." (§ 20.) The criminal act necessary to be liable for aiding and abetting murder is "to directly 'aid, facilitate, promote, encourage, or instigate' . . . murder" and not some lesser target offense. (*People v. Pacheco* (2022) 76 Cal.App.5th 118, 128 (*Pacheco*).) The concurrent criminal intent with which the act must be committed comprises both (1) the aider and abettor's own intent to kill, and (2) the aider and abettor's knowledge of the direct perpetrator's murderous purpose. (*Lopez*, *supra*, 14 Cal.5th at p. 579.)

17

Here, the jury's finding on the multiple-murder special circumstance reflects that the jury found that Lomeli himself intended to kill.[8] (See § 190.2, subd. (c).) Under current law, then, the jury would need to also find that Lomeli's act—saying, "Pull it out"— amounted to aid, encouragement or facilitation of murder, not a life-endangering target offense like assault with a firearm. (*Pacheco*, *supra*, 76 Cal.App.5th at p. 128.) The jury would likewise need to find that Lomeli knew that Herena or Cruz—without further encouragement, direction, or provocation—would shoot to kill rather than merely draw or brandish their weapons. (*People v. Perez* (2005) 35 Cal.4th 1219, 1225; *Lopez*, *supra*, 14 Cal.5th at p. 579 [requiring direct aider and abettor to have encouraged commission of murder " 'with knowledge of the unlawful purpose of the perpetrator and with the intent or purpose of committing, encouraging, or facilitating its commission' "]; see also *People v. Reyes* (2023) 14 Cal.5th 981, 992 (*Reyes*) [reversing denial of § 1172.6 petition for trial court's failure to consider "whether [aider and abettor] knew [direct perpetrator] intended to shoot at the victim"].)

In other words, the jury's finding that Lomeli *intended* to kill Ayala and that he acted willfully, deliberately, and with premeditation in saying, "Pull it out," is but one element of murder liability as a direct aider and abettor. This finding does not compel the further conclusion that Lomeli *knew* on issuing the directive that Herena intended not only to comply but to kill, as would be required to be liable for murder as a direct aider and abettor. (See *People v. Curiel* (2023) 15 Cal.5th 433, 470 (*Curiel*).) Nor is it obvious that the jury necessarily found that Lomeli's act amounted to encouragement to kill rather than to brandish or assault. (See *Pacheco*, *supra*, 76 Cal.App.5th at p. 128.)

---

[8] Ordinarily a first degree premeditated murder verdict would likewise establish an intent to kill. But the trial court's incomplete efforts to reconcile the pattern jury instructions with the recently decided *Chiu*, *supra*, 59 Cal.4th 155 left it open for the jury to find Lomeli guilty of first degree premeditated murder based on Herena's commission of murder if Lomeli aided and abetted or conspired in Herena's committing assault with a firearm. (See *ante*, pp. 15–16.)

A rational jury could of course infer that Lomeli when exhorting Herena to "pull it out" knew at that moment that Herena intended to kill. But with alternative-theory error, we must determine whether " ' "[n]o reasonable jury . . . could have failed to find" ' the facts necessary to support a valid theory." (*Lopez*, *supra*, 14 Cal.5th at p. 585.) And as we have explained, in this context we do not look for substantial evidence or view the evidence in the light most favorable to the judgment. (*Id*. at p. 591; *Ferrell*, *supra*, 14 Cal.5th at pp. 604–605.) Properly viewed from the contrary perspective, the record does not establish that the jury necessarily would have found Lomeli, in telling Herena to "[p]ull it out," knew that Herena would not only exhibit the firearm but would shoot— and shoot to kill. The jury's finding on the special circumstance establishes that it found Lomeli intended to kill at the time of the killing, but it establishes neither Lomeli's knowledge of Herena's intent at the time of the aiding and abetting nor the target offense that saying "pull it out" would encourage or assist.

The Supreme Court in *Lopez*, for example, determined that although the jury's true finding of a gang-murder special circumstance under section 190.2, subdivision (a)(22) similarly required an intent to kill, the instruction on the special circumstance "falls far short" of accounting for direct aiding and abetting liability. (*Lopez*, *supra*, 14 Cal.5th at p. 588.) Likewise, in *Curiel*, *supra*, 15 Cal.5th 433, our high court recently concluded that an intent to kill "standing alone is insufficient to establish the requisite mens rea for aiding and abetting murder" and not some lesser target offense. (*Id.* at p. 468.) "[A] defendant could act with intent to kill but at the same time . . . be genuinely surprised when the actual perpetrator commits a life-endangering act"—even if that act was foreseeable. (*Id.* at p. 470.) To convict Lomeli of murder as a direct aider and abettor, the jury needed to find beyond a reasonable doubt that he knew in telling Herena to "pull it out" that Herena then intended to kill.

Here, a rational jury could plausibly question whether Lomeli, though intending to kill Ayala, expected Herena or Cruz would draw their weapons but hold their fire, absent

19

further direction by Lomeli as he gauged Ayala's reaction to the show of force. We accordingly cannot say that " 'it would be impossible' " for a rational jury to entertain a reasonable doubt as to what Lomeli knew of Herena's intent in that moment. (*Lopez, supra*, 14 Cal.5th at p. 591.)

Nor does the finding of intent to kill necessary to a special circumstance conclusively establish that the target crime that an accomplice acted to aid and abet was murder. In *Pacheco*, the jury's true finding on the gang-murder special circumstance established that the defendant intended the victim's death at the time of the killing, but this finding did not entitle the trial court to deny the defendant's section 1172.6 resentencing petition without a full evidentiary hearing. (*Pacheco, supra*, 76 Cal.App.5th at p. 128.) Reversing the summary denial, the Fourth District reasoned, "[I]t is possible Pacheco intended to kill" while aiding and abetting lesser target offenses but "did nothing to directly 'aid, facilitate, promote, encourage, or instigate' . . . murder." (*Ibid.*) Because the jury had been instructed that the defendant could be guilty of murder if he aided and abetted several target crimes, of which murder was a natural and probable consequence, "the jury could have potentially found [the defendant] intended to kill [the victim] under the gang special circumstance enhancement (the mens rea) but under the natural and probable consequence theory, [the defendant] only actually aided and abetted the nontarget crime of disturbing the peace (the actus reus)." (*Ibid.*) The gang-murder special circumstance thus did not establish as a matter of law that the defendant was liable for murder under a valid theory. (*Ibid.*)

A similar concern was raised by our high court in *Curiel*. In holding that a jury's true finding of an intent to kill did not conclusively establish that a defendant was liable for murder under current law, the high court noted that the jury's finding of intent to kill satisfied only one aspect of the necessary mental state and did not establish a valid theory of direct aiding and abetting liability. (*Curiel, supra*, 15 Cal.5th at p. 446.) But beyond the mens rea, the *Curiel* court questioned whether the act that aided and encouraged the

20

target offense sufficed as an act aiding and encouraging murder; it rejected the Attorney General's argument that the close causal relationship between the underlying crime and the murder necessarily meant that any act that aided or encouraged the target offense was sufficient to aid and abet murder:  "Although in many factual scenarios the Attorney General may be correct that the same act would satisfy the actus reus of aiding and abetting the underlying target crime and aiding and abetting the murder that results, we are unsure that the same act must necessarily satisfy each as a matter of law."  (*Id.* at p. 467.)  As in *Pacheco* and *Curiel*, the jury's determination that the killing was willful, deliberate, and premeditated and that Lomeli had the intent to kill does not encompass all the elements of direct aiding and abetting liability.[9]

The jury here was instructed that the target offense was assault with a semiautomatic firearm, and we recognize that one who commits a wrongful act sufficient to aid and abet an assault with a semiautomatic firearm will in many cases have committed a wrongful act sufficient to directly aid and abet murder.  (See *Curiel*, *supra*, 15 Cal.5th at p. 467.)  But assault with a semiautomatic firearm does not require discharge of the firearm or even "actually point[ing] the gun directly at the other person."  (*People v. Raviart* (2001) 93 Cal.App.4th 258, 263.)  Nor was there evidence that Lomeli's act extended to supplying the firearm or directing Herena to aim or fire. Lomeli's act was limited to directing Herena to draw a weapon that the prosecution maintained Herena as a gang member was already independently primed to use.  There was no evidence of further instigation or expression of impatience by Lomeli in the

---

[9] We acknowledge that *Pacheco* and *Curiel* are distinguishable in addressing the denial of a section 1172.6 resentencing petition before the prima facie stage.  At the prima facie stage of a section 1172.6 proceeding, the trial court's inquiry is limited to " 'readily ascertainable facts from the record (such as the crime of conviction), rather than factfinding involving the weighing of evidence or the exercise of discretion.' " (*Pacheco*, *supra*, 76 Cal.App.5th at p. 125.)  But these authorities remain instructive on the elements of direct aiding and abetting liability beyond intent to kill.

21

approximately 10 seconds that Andres testified Herena had the gun pointed in the air while backing toward the street. And even assuming the sufficiency of saying "Pull it out" as the wrongful act directly aiding and abetting murder rather than merely assault, this would not resolve whether Lomeli's wrongful state of mind encompassed both intent to kill and knowledge that Herena shared that same intent. (See *Curiel*, at pp. 467–468.) In other words, a rational jury persuaded that Lomeli intended to kill could still have had a reasonable doubt whether Lomeli knew Herena would shoot to kill without more direction than Lomeli had by then given.[10]

We do not question the sufficiency of the evidence to support findings necessary under current law, but our review of alternative-theory error is stringent. "The question

_____

[10] We note the prosecution based its case for Lomeli's intent to kill almost exclusively on the gang evidence admitted under former section 186.22 and the criminal propensity suggested by that evidence. For example, the trial court admitted Lomeli's juvenile adjudication exclusively under former section 186.22, not under any other theory of admissibility argued by the prosecution. And under section 186.22 as now amended, the continuing relevance of that prior act—and thereby its admissibility—is not apparent on this record. But the inference of bare criminal propensity from the juvenile adjudication was strong, and the prosecution did not shirk from arguing it. The prosecutor during closing argument urged the jury to consider when judging the defendants' mental states that "gangs and guns equals murder in the world of [EHP]" and argued that Lomeli's juvenile adjudication for assault with a deadly weapon signified that Lomeli was the "leader" of the trio—despite his youth and despite his counsel's argument that it was Herena who had "the real gang credentials." The juvenile adjudication was the only evidence that any of the three codefendants had previously committed a violent act, and it allowed the prosecution to argue that Lomeli "has more pattern crimes than Juan Cruz and Abel Herena put together."

Even if the jury's finding on the special circumstance and Lomeli's intent to kill were otherwise final, the significance of Assembly Bill No. 333's change to section 186.22 could counter its preclusive effect to the extent that certain evidence bearing on intent may not have been admissible or would have been irrelevant under the new law. (Cf. *Curiel*, *supra*, 15 Cal.5th at p. 454 [acknowledging, in the issue preclusion context, an equitable exception to application of the doctrine]; see also *People v. Jimenez* (2024) 103 Cal.App.5th 994, 1005 [holding that a significant intervening change in law warranted relitigation of an otherwise final determination of malice].)

22

here is not the sufficiency of the evidence to support a valid theory, but its opposite." (*Lopez*, *supra*, 14 Cal.5th at p. 591.)  However unlikely it might be that a jury convinced under former law of Lomeli's intent to kill would have stopped short of finding the wrongful act and knowledge of the direct perpetrator's purpose necessary for direct aider/abettor liability, we cannot say it would have been impossible on this record.  (*Id.* at p. 585.)  The alternative-theory error is not harmless because Lomeli "contested the omitted element and raised evidence sufficient to support a contrary finding."  (*Neder v. United States* (1999) 527 U.S. 1, 19.)  We therefore reverse and remand the matter to the prosecutor to retry Lomeli on a legally valid theory of murder.  (*People v. Hola* (2022) 77 Cal.App.5th 362, 371 (*Hola*) [when there is change in law that invalidates a previously valid theory of guilt relied upon by the prosecution and reversal is warranted, a new trial should be permitted on legally valid theories].)

### b.    *Cruz*

As to Cruz's murder convictions, we find that the alternative-theory error is not harmless beyond a reasonable doubt.  Finding Cruz guilty of second degree murder, the jury necessarily rejected the prosecution's first degree theories of a willful, deliberate, and premeditated killing or a conspiracy to commit murder.  The jury could thus have convicted Cruz based on the theory that he aided and abetted an assault with a firearm and that the natural and probable consequence of that assault was murder, a theory now invalid in that it did not require that he acted with malice.  (§ 188, subd. (a)(3) ["[m]alice shall not be imputed to a person based solely on his or her participation in a crime"]; *People v. Offley* (2020) 48 Cal.App.5th 588, 599 (*Offley*).)  Cruz's intent, under that theory, would have merely been an intent to commit an assault with a firearm, not an intent to kill.  Thus, "any rational juror who made the findings reflected in the verdict and heard the evidence at trial could have had reasonable doubt regarding the findings necessary to convict the defendant on a valid theory"—in this case, a theory of direct aiding and abetting.  (*Lopez*, *supra*, 14 Cal.5th at p. 591.)

23

The Attorney General argues that Cruz could not have been convicted as an aider and abettor, or even an aider and abettor to an implied malice murder, because the prosecutor focused his argument about aider and abettor liability only on Lomeli, treating Cruz as a direct perpetrator.[11]  Although the prosecutor's direct-perpetrator argument is a "relevant circumstance in determining whether instructional error is harmless" (*People v. Powell* (2021) 63 Cal.App.5th 689, 715), the prosecutor never expressly disclaimed reliance on such a theory as to Cruz in his argument.  And our review of the record yields little support for the Attorney General's assertion that the jury necessarily found that "Cruz proximately caus[ed] [the victims'] deaths."  The jury's true finding under section 12022.5, subdivision (d) established that it found Cruz's personal and intentional discharge of a firearm proximately caused either "great bodily injury *or* death."  The jury's adjudication of the enhancement thus does not amount to a finding that Cruz was an actual killer.

Nor does the record compel the conclusion that any reasonable jury would necessarily find Cruz to be an actual killer.  " ' "To be considered the proximate cause of the victim's death, the defendant's act must have been a substantial factor contributing to the result, rather than insignificant or merely theoretical." ' " (*Reyes*, *supra*, 14 Cal.5th at

---

[11] We do not read the prosecutor's closing argument as exclusively focused on direct perpetrator liability for either Cruz or Herena.  The prosecutor told the jury, "[L]et's say half of you think for defendant Herena or defendant Cruz [he's] a direct perpetrator of the murder, and the other half think that it was by aiding and abetting . . . .  So long as all of you agree, yes, the defendant is guilty of murder . . . .  [¶] . . . you do not need to agree on the theory . . . how you get there."  After arguing for Lomeli's liability as an aider and abettor, the prosecutor went on to say, "But also think about aiding and abetting liability with respect to defendant Herena and defendant Cruz."  It also appears clear in context that the prosecutor's theory of direct perpetrator liability turned on who fired the .22-caliber rounds:  After discussing the inchoate theories of liability generally, the prosecutor suggested they would be relevant to Herena "if you decide that he didn't fire the .22" or likewise to Cruz "if you determine he didn't fire the .22."

24

p. 988.)  The medical testimony and crime scene evidence did not show either of the .32-caliber shots to have been independently fatal or to have struck either victim before the fatal .22-caliber shots Herena did not dispute having fired, and the testifying eyewitnesses shed no light on when Cruz fired (or even drew his gun) relative to Herena's fatal .22-caliber shots.  Like Cruz, we do not rule out the possibility that some jurors may have concluded that the .32 caliber gunshots the jury attributed to Cruz were substantial factors contributing to the victims' deaths, but the evidentiary record here does not establish beyond a reasonable doubt that the jury *necessarily* found this to be the case.  We accordingly cannot adopt the Attorney General's theory that Cruz could only have been convicted as a direct perpetrator.

As to aider and abettor liability, neither the evidence nor the jury findings dispel a reasonable doubt whether Cruz intended to kill or had implied malice when he discharged his weapon.  Cruz testified that he fled in fear.  Although the jury discredited his claim that he had been unarmed, it was still free to credit his claim of fear.  (*People v. Williams* (1992) 4 Cal.4th 354, 364 ["a trier of fact is permitted to credit some portions of a witness's testimony, and not credit others"].)  The jury could thus have a reasonable doubt as to whether Cruz fired directly on Ayala and Rodriguez, aware that doing so " ' "endanger[ed] the life of another," ' " or fired only blindly in flight while aware that his conduct risked serious bodily injury, which is insufficient.  (See *People v. Knoller* (2007) 41 Cal.4th 139, 143.)

For example, in *Ferrell*, *supra*, 14 Cal.5th 593, the California Supreme Court considered whether alternative-theory error, when the jury was instructed on a now-invalid theory of felony murder, was harmless.  (*Id.* at pp. 601–602.)  The *Ferrell* court concluded that neither the jury's true finding on the firearm enhancement nor the trial evidence established implied-malice murder.  (*Id.* at p. 604.)  Acknowledging that prosecution witnesses testified that Ferrell shot toward the victim and other gang members—which conflicted with Ferrell's trial testimony that he shot "skyward" (*id.* at

25

p. 605)—*Ferrell* held that the "jurors could have, consistent with the intentional discharge finding, reasonably rejected the factual premise—a gunshot intentionally fired at people—that the Secretary equates with malice." (*Ibid.*)

*Ferrell* explained that implied-malice murder has both a physical component, "an act whose natural consequences are dangerous to life," and a mental component, "defendant's deliberate performance of the act with conscious disregard for life, knowing the act endangers another's life." (*Ferrell*, *supra*, 14 Cal.5th at p. 604.) Thus, that the jury rejected Cruz's defense that he was unarmed does not by itself render the alternative-theory error harmless. The enhancement under section 12022.53, subdivision (d) is a "general intent enhancement, and does not require the prosecution to prove that the defendant harbored a particular mental state as to the victim's injury or death." (*Offley*, *supra*, 48 Cal.App.5th at p. 598.) The enhancement requires only that the prosecutor prove that the defendant intended to discharge a firearm. (*Ibid.*) The jury's finding that Cruz *intentionally* discharged a firearm resulting in great bodily injury or death is not the same as a finding that he intended to kill or acted with conscious disregard for life.

To be sure, one of the .32-caliber shots struck Rodriguez's abdomen. But there was no eyewitness testimony about how Cruz came to draw, aim or fire his gun, and neither the jury's verdicts nor the evidence conclusively establish that Cruz *intended* not only to fire but to shoot directly at Rodriguez or Ayala. (Cf. *People v. Chun* (2009) 45 Cal.4th 1172, 1205 [where defendant was found to have intentionally fired at an occupied motor vehicle, "[n]o juror could have found that defendant participated in the shooting . . . without also finding that defendant committed an act that is dangerous to life and did so knowing of the danger and with conscious disregard for life"].)

Based on this record, then, the jury could have accepted Cruz's description of his own mental state but rejected his account of his acts—the jury's second degree murder convictions, under this theory, could be harmonized with its true finding as to the firearm

26

enhancement. And the jury could have readily found him to be guilty of second degree murder under an invalid natural and probable consequences theory, which required a finding that "[t]he defendant is guilty of an assault with a firearm," "a coparticipant in the assault with a firearm committed the crime of murder," and the "murder was a natural and probable consequence of commission of assault with a firearm."

We therefore conclude that we must reverse both of Cruz's second degree murder convictions and remand the matter for a possible retrial. (*Hola*, *supra*, 77 Cal.App.5th at p. 371.)[12]

### c. *Herena*

We cannot say the same of Herena: it was Herena who first drew his gun, the circumstantial evidence identified him as the shooter of the fatal .22-caliber rounds (as his counsel conceded), and the jury found that he personally discharged a firearm causing great bodily injury or death (§ 12022.53, subd. (d)).

Herena, however, argues that the jury could instead have considered him to be an aider and an abettor or a conspirator, to the extent the jury found Cruz, too, had fired a gun. Our review of the record belies this notion. We acknowledge that the instructions standing alone left it theoretically possible to convict Herena of first degree murder as an aider and abettor of Cruz's assault, the natural and probable consequences of which was Cruz's commission of first degree murder. But the jury did not convict Cruz of first

---

[12] Because we reverse Cruz's murder convictions, we need not reach his argument that the trial court erred by failing to instruct on the lesser related offense of accessory after the fact. (But see *People v. Jennings* (2010) 50 Cal.4th 616, 668 [observing that "California law does not permit a court to instruct concerning an uncharged lesser related crime unless agreed to by both parties"].) Our reversal of the murder convictions also makes it unnecessary to reach Cruz's claim of error under Evidence Code section 356, though we note that "Court Exhibit 3"—the full transcript of the interrogation, the page and line numbers of which the parties used to identify the disputed passages in the trial court—does not appear to have been transmitted to this court for review. (See *People v. Chubbuck* (2019) 43 Cal.App.5th 1, 13 [challenge to trial court's finding of a strike offense forfeited due to failure to transmit exhibit for appellate review].)

degree murder and demonstrably found Cruz less culpable than Herena, despite its finding that Cruz personally discharged a firearm. Alternative-theory error is harmless if we can determine from the record before us beyond a reasonable doubt "that any rational juror would have made the additional findings, based on the jury's actual verdict and the evidence at trial." (*Lopez*, *supra*, 14 Cal.5th at p. 589.) To the extent the jury convicted Herena solely as the direct perpetrator, the jury necessarily found that Herena intended to kill, and that he did so willfully, deliberately, and with premeditation based on the jury's instructions with CALCRIM No. 521.

What differentiates Herena's conviction from Lomeli's is that the jury's findings on the firearm enhancement and the multiple-murder special circumstance signify the jury necessarily found that Herena was one of the actual shooters and that Herena's lethal acts were willful, deliberate, and premeditated. Any rational juror who made these findings would have necessarily made the findings sufficient to convict Herena on a legally valid theory as the direct perpetrator. (*Lopez*, *supra*, 14 Cal.5th at p. 591.) "Indications that the jury considered an invalid theory, without more, do not undermine [this] conclusion." (*Id.* at p. 592.) For these reasons, we are persuaded that the presentation of the invalid natural and probable consequences theories "made no difference" to the jury's verdict of first degree murder against Herena. (*Id.* at p. 589.)

Accordingly, the alternative-theory error is harmless beyond a reasonable doubt as to Herena. (*Lopez*, *supra*, 14 Cal.5th at pp. 584–585.)

## B. *Instructional Error on the Burden of Proof*

Following closing argument, the trial court made suggestions to the jury about how to approach deliberations. The court noted there were "hundreds of ways that you can examine the evidence" and "[t]he fact that I'm the judge and I'm giving you this one example does not indicate that this is the example that you should follow." The court then proposed: "As you review the evidence, you may wish to make a chart for each count and allegations for each defendant. . . . [¶] On one side, list the evidence and

reasoning supporting one position; and on the other side—this is for each defendant—each defendant independently for each count. On one side, list the evidence and reasoning supporting one position; and on the other side, list the evidence and arguments supporting the other position. [¶] This may be helpful not to see which—which side has a longer list, but to help you make a reasoned decision, based on the evidence and the [c]ourt's instruction regarding the law." The defendants argue that the trial court's suggestion amounted to an instruction that was legally incorrect and diluted the prosecution's burden of proof.[13]

We find no prejudicial error. "The Constitution 'does not require that any particular form of words be used in advising the jury of the government's burden of proof,' but it does require that, ' "taken as a whole, the instructions . . . correctly conve[y] the concept of reasonable doubt to the jury." ' " (*People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 839.) "What matters, for federal constitutional purposes, is 'whether there is a reasonable likelihood that the jury understood the instructions to allow conviction based on' insufficient proof." (*Id.* at p. 840.) There is no reasonable likelihood that the jury would have misapplied the trial court's instructions.

Here, the trial court's suggested strategy for the jury to approach deliberations did not purport to displace its legally correct instructions on proof beyond a reasonable doubt. But the court at no point implied that anything less than proof beyond a reasonable doubt for every element of each charge would suffice for a criminal conviction.

The court instructed the jury with CALCRIM No. 220, the standard instruction on reasonable doubt: "A defendant in a criminal case is presumed to be innocent. This presumption requires that the People prove a defendant guilty beyond a reasonable doubt." In fact, the informal guidance from the trial court here—that the jury could make

---

[13] Although none of the defendants objected to the trial court's comments when they were made, defendants argue on appeal that the trial court's statements affected their substantial rights. Such claims are typically not subject to forfeiture. (See § 1259.)

a "list" of the "evidence and reasoning" supporting each side is not substantially different from the language of CALCRIM No. 220 which was also given. CALCRIM No. 220 itself specifically states: "[i]n deciding whether the People have proved their case beyond a reasonable doubt, you must impartially compare and consider all the evidence that was received throughout the entire trial." Multiple courts have found that the language of CALCRIM No. 220 requiring the jury to "compare and consider" the evidence does not shift the burden of proof to the defendant, nor does it preclude the jury from considering a lack of evidence. (See *People v. Garelick* (2008) 161 Cal.App.4th 1107, 1118; *People v. Hernandez Rios* (2007) 151 Cal.App.4th 1154, 1157.) We accordingly find no error.

Arguing otherwise, the defendants analogize the trial court's statements to the erroneous instruction given by the trial court in *People v. Garcia* (1975) 54 Cal.App.3d 61 (*Garcia*). In *Garcia*, the trial court instructed the jury that reasonable doubt means " 'doubt that presents itself in the minds of reasonable people who are weighing the evidence in the scales, one side against the other, in a logical manner in an effort to determine wherein lies the truth.' " (*Id.* at p. 68.) The *Garcia* court noted that this language was "strikingly comparable to the civil case rule of ' "preponderance of evidence," ' " and a " 'weighing' process, where a tipping of the scales determines the 'truth,' is wholly foreign to the concept of proof beyond a reasonable doubt." (*Id.* at p. 69.)

*Garcia* is distinguishable in that the instruction there at issue "purported to explain the meaning of the earlier instruction on reasonable doubt" and as "the [court's] last definitive instruction on the subject . . . must reasonably be deemed to have been uppermost in the minds of the jury during their deliberations." (*Garcia, supra*, 54 Cal.App.3d at p. 70, italics omitted.) Here, the trial court specifically framed its comments as "suggestions" to the jury solely as to how it might choose to organize its deliberations. The trial court did not imply that its comments were meant to modify or

otherwise clarify its prior instructions on the law, including its correct instruction on the burden of proof. The trial court even cautioned the jury that it did not intend to suggest that the two "lists" should be compared. And the trial court in no way informed the jury that it should disregard the prosecutor's burden of proof or that the prosecutor's burden of proof would be satisfied upon a comparison of the suggested "lists."

On appeal, we must "examine the jury instructions as a whole, in light of the trial record, to determine whether it is reasonably likely the jury understood the challenged instruction in a way that undermined the presumption of innocence or tended to relieve the prosecution of the burden to prove defendant's guilt beyond a reasonable doubt." (*People v. Paysinger* (2009) 174 Cal.App.4th 26, 30.) Read alone, these suggestions could be construed as ambiguous, but when considered with the instructions as a whole it is not reasonably likely the jury would have misapplied the law. We therefore conclude that the trial court's statements here did not dilute the prosecutor's burden of proof.

Moreover, even assuming the trial court's comments were improper, the defendants cannot demonstrate prejudice under any standard. Instructional error affecting the burden of proof is reversible error "unless it can be shown beyond a reasonable doubt that the error did not contribute to the jury's verdict." (*People v. Cole* (2004) 33 Cal.4th 1158, 1208; *Chapman*, *supra*, 386 U.S. 18, 24.)

As we have observed, the jury was correctly instructed that it could not find the defendants guilty of the charged offenses and allegations until the prosecutor met its burden of proof beyond a reasonable doubt and was given the standard pattern instruction on reasonable doubt, CALCRIM No. 220. The trial court's comments were not a part of the formal jury instructions on the law and were given as part of its suggestions as to how the jury could proceed with its deliberations. Considering the record, we have no reasonable doubt that the jury properly understood the prosecutor's burden to prove each element of the offense beyond a reasonable doubt. Thus, any error was harmless. (*Chapman*, *supra*, 386 U.S. at p. 24.) We must reiterate, however, that we do not endorse

31

the trial court's proposal here as its comments were neither necessary nor particularly helpful, and caution that courts should tread carefully when volunteering suggestions to the jury as to how to approach the deliberative process, as these risk distracting the jury from its duty to decide beyond a reasonable doubt a defendant's guilt.

## C. *Instructional Error on Self-Defense*

After the close of evidence, the jury was instructed on self-defense and defense of others. Consistent with the pattern instruction on self-defense, the trial court instructed the jury that "the defendant must have believed there was imminent danger of death or great bodily injury to himself or someone else. Defendant's belief must have been reasonable, and he must have acted only because of that belief." On the prosecution's request, the jury was also instructed that "[t]he right of self-defense is not available if the motivating cause for the use of deadly force is a feeling or emotion other than fear. Other emotions may be present *but cannot be casual* [*sic*] *factors in the decision to use deadly force*." (Italics added.) In part, this instruction was based on *People v. Trevino* (1988) 200 Cal.App.3d 874, 879 (*Trevino*), which held that "[t]he party killing is not precluded from feeling anger or other emotions save and except fear; however, those other emotions cannot be causal factors in his decision to use deadly force." On appeal, Herena argues that this instruction was erroneous and caused prejudice. He contends that a killing based on mixed motives is justifiable so long as fear was a substantial factor in the decision to kill. Reviewing de novo whether the jury instruction correctly states the law (*People v. Posey* (2004) 32 Cal.4th 193, 218 (*Posey*)), we find no error.[14]

---

[14] The Attorney General argues that this claim is forfeited because the defendants failed to object and in fact agreed to the proposed instruction. (See *People v. Hudson* (2006) 38 Cal.4th 1002, 1011–1012 [holding that failure to object forfeited claim that an instruction correct in law and responsive to evidence was too general or incomplete].) Herena's claim, however, is not that the instruction was too general or required clarification, but that the instruction misstated the law. This is a pure question of law that we review de novo. (*Posey*, *supra*, 32 Cal.4th at p. 218.)

The mere existence of fear along with other motives for resort to deadly force does not justify homicide. As relevant here, homicide is justifiable under section 197, "(1) When resisting any attempt to murder any person, or to commit a felony, or to do some great bodily injury upon any person. [¶] (2) When committed in defense . . . against one who manifestly intends or endeavors, by violence or surprise, to commit a felony, . . . . [¶] (3) When committed in the lawful defense of [any person] when there is reasonable ground to apprehend a design to commit a felony or to do some great bodily injury, and imminent danger of such design being accomplished . . . ." But "A bare fear of the commission of any of the offenses mentioned in subdivisions 2 and 3 of Section 197 . . . is not sufficient to justify" homicide: "[T]he circumstances must be sufficient to excite the fears of a reasonable person, and the party killing must have acted under the influence of such fears alone." (§ 198.)

In *Trevino*, the Fifth District considered and rejected an argument that section 198 applies only to subdivisions (2) and (3) of section 197, and not to section 197, subdivision (1). (*Trevino*, *supra*, 200 Cal.App.3d at p. 878.) "[A]n instruction which states that the party killing must act under the influence of such fears alone, is a correct statement of the law." (*Id.* at p. 879.) "The party killing is not precluded from feeling anger or other emotions save and except fear; however, those other emotions cannot be causal factors in his decision to use deadly force. . . . [I]f the only causation of the killing was the reasonable fear that there was imminent danger of death or great bodily injury, then the use of deadly force in self-defense is proper, regardless of what other emotions the party who kills may have been feeling but not acting upon." (*Ibid.*)

The California Supreme Court has recognized that a defendant who kills in response to an imminent threat of deadly force cannot claim self-defense if "he did not act on the basis of fear alone but also on a desire to kill." (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1044 (*Nguyen*).) An instruction that states that a party killing must act

33

under the influence of such fears alone is a correct statement of the law. (*Id.* at p. 1045, citing *Trevino*, *supra*, 200 Cal.App.3d at p. 879.)

Herena argues that *Nguyen* left open the question presented here—whether a killing is justified if fear was a "but-for" reason to kill but was not the *only* motivating factor. In *Nguyen*, the high court noted, "[D]efendant did not argue in the trial court, nor has he argued on appeal, that the jury should have been instructed that acting based on mixed motives is permissible so long as reasonable fear was the but-for cause of his decision to kill. We therefore have no occasion to consider whether such a rule would be consistent with section 198 as interpreted in *Trevino* or other cases." (*Nguyen*, *supra*, 61 Cal.4th at p. 1046.)

The defendants argue that in various civil and tort contexts, "causation" has been defined differently than as articulated in *Trevino*, with either a "substantial factor" or a "but for" definition, which would permit a defendant to act upon mixed motives. (See *State Dept. of State Hospitals v. Superior Court* (2015) 61 Cal.4th 339, 352–353, fn. 12; *Viner v. Sweet* (2003) 30 Cal.4th 1232, 1239–1241.) And that in the criminal context, the "but for" causation and the "substantial factor" test have been approved in various CALCRIM instructions, including in CALCRIM No. 520 and CALCRIM No. 729. CALCRIM No. 520, which defines degrees of murder, explains that an act "causes death only if it is a substantial factor in causing the death"; CALCRIM No. 729, which defines a special circumstance murder based on race, religion, or nationality, explains that "[i]f the defendant had more than one reason to commit . . . the murder, the deceased person's race, color, religion, nationality, or country of origin must have been a substantial factor motivating the defendant's conduct."

But the defendants' arguments run contrary to the statutory language of section 198 itself. Section 198 expressly states that "the party killing must have acted under the influence of *such fears alone.*" (Italics added.) Interpreting section 198 to instead conclude that a "substantial factor" test applies would run afoul to the plain text

of section 198. The pinpoint instruction provided by the trial court did not inform the jury that it had to reject self-defense if the defendants harbored feelings other than fear toward their victims. The jury was specifically instructed that "[o]ther emotions can be present." The instruction correctly stated that those other emotions cannot motivate the killing—in other words, that a defendant cannot avail himself of self-defense unless he acts on those "fears alone" (§ 198)—i.e., that fear must be the "causal factor" in the killing.

Finally, the defendants also argue that even if *Trevino* is a correct statement of law, the trial court erred deriving the pinpoint instruction from the language of *Trevino* itself. Quoting *People v. Hunter* (2011) 202 Cal.App.4th 261, Herena argues that "our Supreme Court has strongly cautioned 'that when evaluating special instructions, trial courts carefully consider whether such derivative application is consistent with their original usage' " in relying on an opinion to formulate an instruction. (*Id.* at p. 278.) Herena thus contends that the trial court here failed to make a "necessary inquiry" when relying upon *Trevino*. (*Hunter*, at p. 278.) But he bases this contention on the incorrect assumption that the language in *Trevino* was infirm in that the *Trevino* court did not intend its reference to "causal factors in [the] decision to use deadly force" (*Trevino*, *supra*, 200 Cal.App.3d at p. 879) to encompass the concepts of "but for" or "proximate cause." Yet, as we have explained, the language in *Trevino* reflects the statutory text of section 198 in limiting self-defense to situations when a defendant acts on "such fears alone."

Because the trial court's instructions correctly conveyed the law to the jury, we conclude that no error occurred.

## D.     *Exclusion of Andres's Prior Statements*

Herena argues that the trial court erred by excluding Andres's prior statements that the man with the gun (Herena) appeared scared, retreated from the victims, and appeared

reluctant to use his weapon. Although the trial court erred by excluding the evidence, the error was not prejudicial.

### 1.     *Additional Background*

While cross-examining Andres, Cruz's counsel asked, "Did you feel as though the guys were scared because the way they were—that one guy was holding the gun?" He also asked if there was "something about the way the male was using the gun that made it appear to you that he did not want to use it." The prosecutor objected to both questions, which the trial court sustained.

Cruz's counsel also asked Andres if he recalled testifying at the preliminary hearing that he described the person with the gun as "retreating in a northerly direction towards San Antonio Court." Cruz's counsel sought to refresh Andres's recollection with his prior statements at the preliminary hearing, where Andres was asked if the person with the gun was "retreating in a northerly direction towards San Antonio Court."[15] The trial court at the preliminary hearing overruled the prosecutor's objection, noting: "I think—I think it to mean a direction." After overruling the objection, Andres answered "[y]es" to the question.

Based on the colloquy at the preliminary hearing, the trial court determined that in context, Andres's "[y]es" at the preliminary hearing was in reply to the court's directive that "retreat" meant movement in a northerly direction. The trial court then struck the term "retreat" and replaced it with the term "moving." To refresh Andres's recollection, Cruz's counsel then asked him if he recalled answering "[y]es" to whether the other individuals in the group "were moving also in a northerly direction towards San Antonio Court."

---

[15] There were two preliminary hearings related to this case as it was initially prosecuted under a different trial court case number and dismissed. The preliminary hearing transcript at issue is not a part of the record on appeal.

36

Later, Herena's counsel sought to clarify whether he could introduce a prior statement Andres made during an interview where he said: "Those guys were backing up, even though they had a gun. They're trash-talking. Like, they don't want to do anything. They're trying to scare us away." The trial court excluded the testimony, reasoning "[i]t's the mental state of what someone else is wanting to do."

## 2.    *Erroneous Exclusion of Evidence*

"We review for an abuse of discretion a trial court's ruling that a question calls for speculation from a witness." (*People v. Thornton* (2007) 41 Cal.4th 391, 429.)  Although this discretion is broad, a trial court abuses its discretion if it rules without understanding the legal standards that apply to the decision.

Under Evidence Code section 800, "[i]f a witness is not testifying as an expert, his testimony in the form of an opinion is limited to such an opinion as is permitted by law, including but not limited to an opinion that is:  [¶]  (a) Rationally based on the perception of the witness; and  [¶]  (b) Helpful to a clear understanding of his testimony."  Although prohibited from "giv[ing] an opinion about another's state of mind," a lay witness "may testify about objective behavior and describe behavior as being consistent with a state of mind."  (*People v. Chatman* (2006) 38 Cal.4th 344, 397 (*Chatman*).)  "A lay witness is . . . permitted to express an ultimate opinion based on his perception, . . . where 'helpful to a clear understanding of his testimony' ([Evid. Code], § 800, subd. (b)), i.e., where the concrete observations on which the opinion is based cannot otherwise be conveyed."  (*People v. Melton* (1988) 44 Cal.3d 713, 744, citing *People v. Hurlic* (1971) 14 Cal.App.3d 122, 127.)

We agree that the trial court abused its discretion when it determined that Andres's prior statements describing the defendants as "backing up, even though they had a gun," "trash-talking . . . [l]ike they don't want to do anything," and "trying to scare us away"

were inadmissible.[16] The trial court did not appear to comprehend that Andres's prior statements were not that the defendants were in fact fearful but that the defendants' respective movements and demeanor reflected a particular state of mind, one that was directly contrary to the prosecution theory that the three were intent on killing from the start. (See *Chatman*, *supra*, 38 Cal.4th at p. 397.) This was admissible, as his statements were based on his own personal observations and did not opine on the defendants' state of mind. (See *ibid.* [finding no error in overruling objection to witness response that defendant appeared to enjoy kicking victim]; *People v. Dalton* (2019) 7 Cal.5th 166, 231–233 [finding no error to admit testimony that victim loved her children based on witness's personal observations and conversations with victim]; *People v. Seumanu* (2015) 61 Cal.4th 1293, 1310 [finding no error in admitting testimony that defendant's brother "looked like he was going to take the beef" for defendant (italics omitted)].) A trial court that "act[s] on a mistaken view about the scope of its discretion" abuses that discretion. (*Riskin v. Downtown Los Angeles Property Owners Assn.* (2022) 76 Cal.App.5th 438, 446; see also *People v. Panozo* (2021) 59 Cal.App.5th 825, 837.) The trial court thus erred by precluding cross-examination on this point.

### 3. *Prejudice*

The defendants argue that excluding Andres's prior statements violated their federal constitutional rights by depriving them of their ability to present a defense and that we should hold the Attorney General to the burden of proving the error harmless

---

[16] As to Andres's prior statements purportedly describing the defendants as "retreating," we reach a different conclusion: It was Cruz's counsel, not Andres, who at the preliminary hearing characterized the defendants' movements as "retreating." And counsel's questions are not evidence. (See *People v. Samayoa* (1997) 15 Cal.4th 795, 843–844.) In clarifying counsel's question, the magistrate defined "retreating" as movement in a northerly direction, to which Andres answered, "[y]es" without ever incorporating the term "retreating" himself into his answer. By striking the term "retreating" from the prior statement, the trial court did not materially alter the contents of Andres's prior statements.

beyond a reasonable doubt under *Chapman*, *supra*, 386 U.S. 18. (See, e.g., *People v. Aranda* (2012) 55 Cal.4th 342, 363 [federal constitutional errors subject to review for harmlessness under *Chapman*].)

But generally, " ' "[a]pplication of the ordinary rules of evidence . . . does not impermissibly infringe on a defendant's right to present a defense." [Citations.]' " (*People v. Cunningham* (2001) 25 Cal.4th 926, 998.) "Although the complete exclusion of evidence intended to establish an accused's defense may impair his or her right to due process of law, the exclusion of defense evidence on a minor or subsidiary point does not interfere with that constitutional right." (*Id.* at p. 999.) In this case, the exclusion of Andres's statements did not completely exclude evidence intended to establish a defense. On cross-examination, the defense was permitted to explore Andres's eyewitness account of the events; defense counsel pointed out that Andres recalled that the defendants were backing away and that Andres recalled only that Herena pointed the gun in the air and not at any of the victims. The trial court's erroneous exclusion of Andres's testimony therefore did not violate the defendants' constitutional rights.

Because the exclusion of evidence did not violate federal constitutional rights, we review error under the standard of prejudice articulated in *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*). (*People v. DeHoyos* (2013) 57 Cal.4th 79, 131 [applying *Watson* standard to exclusion of evidence].) Under *Watson*, reversal is required only if "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*Watson*, at p. 836.) And under this standard, we find no prejudice.

The defense was nonetheless able to introduce and cross-examine Andres about his recollection that the other individuals in the group were moving away—"in a northerly direction towards San Antonio Court"—rather than advancing upon Andres, Ayala, or Rodriguez. Moreover, the probative value of these prior statements would not have been particularly significant. Andres could testify only as to his personal

knowledge of the events, and testimony as to the defendants' specific mental states would have been speculative and inadmissible. And based on Andres's cross-examination, defense counsel was able to argue that the defendants' movements reflected their being fearful or reluctant to use the gun. Cruz's counsel argued in closing that "Andres testified—not before you, but his testimony was read in— . . . that on a previous occasion, he testified that three males were backing up and retreating in a northerly direction toward the street." Herena's counsel in turn argued that when Andres saw the gun, "it was always pointed straight up in the air."

Moreover, we do not find that Andres's statements would have significantly aided Herena's claim of imperfect self-defense. " '[N]ot every unreasonable belief will support a claim of imperfect self-defense'; rather, a defendant can claim imperfect self-defense based only on a belief 'that, if reasonable, would support a claim of perfect self-defense.' " (*People v. Morales* (2021) 69 Cal.App.5th 978, 995.) A person must have an "unreasonable belief in the necessity to defend against imminent peril to life or great bodily injury" for unreasonable self-defense to apply. (*People v. Elmore* (2014) 59 Cal.4th 121, 134.) It is undisputed that Ayala was drunk and belligerent—Andres recalled that he wanted to bring Ayala upstairs because he was afraid that a fight would break out. But Ayala's belligerence itself bore little on whether Ayala's actions would have—even unreasonably—caused Herena to fear for his life: There was no evidence that Ayala was armed, that he brandished a weapon, or threatened bodily harm. Perez testified that she believed that Ayala had initially been "mean-mugging" the group; Andres recalled hearing Lomeli say that he was tired of Ayala disrespecting him and, far from suggesting that Ayala was about to become violent, Lomeli himself later said in a police interview that the people who got out of the car were trying to "disrespect and talk." There was only Cruz's testimony that *he* thought Ayala may have been reaching for his waistband—testimony that the jury in convicting Cruz apparently disbelieved.

40

**E.** *Admission of Hearsay Statement about Lomeli's Prior Juvenile Adjudication*

Given the retroactivity of Assembly Bill No. 333, Lomeli's prior juvenile adjudication was likely inadmissible absent additional factual foundation. (See *ante*, part A.2.b.) Independent of the ameliorative legislation, Lomeli argues that the trial court erred by admitting the investigating officer's testimony that a passerby shouted that she had seen Lomeli try to hit someone with a hammer. We assume that substantial evidence did not support the trial court's determination that the statement was spontaneous and admissible, but we find any error in the admission of this juvenile adjudication was harmless as to Lomeli's remaining convictions.

Improper admission of hearsay may constitute state law error that is assessed under *Watson*, *supra*, 46 Cal.2d 818.[17] (*Valencia*, *supra*, 11 Cal.5th 818, 840.) And "[a]bsent fundamental unfairness, state law error in admitting evidence is subject to the traditional *Watson* test: The reviewing court must ask whether it is reasonably probable the verdict would have been more favorable to the defendant absent the error." (*People v. Partida* (2005) 37 Cal.4th 428, 439.)

Here, aside from the parties' stipulation that Lomeli had a juvenile adjudication, an officer testified at trial that he saw Lomeli chasing someone when a passerby honked

---

[17] In part, Lomeli argues that the hearsay admitted was testimonial and its admission thus violated his Sixth Amendment right to confront witnesses, requiring us to apply the beyond-a-reasonable-doubt standard set forth in *Chapman*, *supra*, 386 U.S. 18. But the passerby's statements were not testimonial; "[s]tatements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency." (*Davis v. Washington* (2006) 547 U.S. 813, 822; see *People v. Pedroza* (2007) 147 Cal.App.4th 784, 793–794 [victim statements were not testimonial when made during ongoing emergency while officers were still ascertaining nature of situation]; see also *People v. Corella* (2004) 122 Cal.App.4th 461, 469 ["it is difficult to identify any circumstances under which a [Evid. Code, §] 1240 spontaneous statement would be 'testimonial' " as it is made without reflection or deliberation and thus not made in contemplation of its testimonial use in a future trial].)

41

her horn and yelled that she had seen Lomeli hit someone with a hammer. We recognize, as Lomeli argues, that the prior juvenile adjudication was the only evidence of violent conduct by Lomeli when the "sole" question at issue was his intent to kill, but we have reversed Lomeli's murder convictions on other grounds. And here, with respect to his assault with a semiautomatic weapon on Perez and his possession of a firearm, there was a substantial amount of evidence of his guilt: It is undisputed that he was present at the scene, there was substantial evidence that he directed his codefendants to draw a weapon, and that his codefendants fired on Ayala without further provocation, injuring Perez in the process. We do not find it reasonably probable that absent this evidence, Lomeli would have received a more favorable verdict on his remaining charges.

## F.     *Sufficiency of the Evidence (Lomeli)*

Lomeli argues that there is insufficient evidence to support his conviction for being a felon in possession of a firearm because there was nothing in the record to reflect that he ever knew that Herena or Cruz were armed, let alone exercised dominion and control over guns they carried. And to the extent Lomeli's knowledge that Herena or Cruz were armed is necessary to any inference that he intended to assault with a firearm, or intended to aid and abet or conspire with any of his codefendants to commit the target offenses, Lomeli for the same reason disputes the sufficiency of evidence to support his other convictions.

An appellant challenging a conviction for insufficient evidence bears a heavy burden. " ' "The proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] On appeal, we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.]" ' " (*People v. Smith* (2005) 37 Cal.4th 733, 738–739.) We conclude that

42

substantial evidence supports Lomeli's remaining convictions and permits retrial as to those we reverse on other grounds.

Section 29800, subdivision (a)(1) provides that "[a]ny person who has been convicted of a felony . . . and who owns, purchases, receives, or has in possession or under custody or control any firearm is guilty of a felony." Actual physical possession of a firearm is not an essential element of the offense, and a conviction may be upheld based on a defendant's constructive possession of a firearm. (*People v. White* (2014) 223 Cal.App.4th 512, 524; *People v. Sifuentes* (2011) 195 Cal.App.4th 1410, 1417 (*Sifuentes*), disapproved of on another point as stated in *People v. Farwell* (2018) 5 Cal.5th 295, 304, fn. 6.) Constructive possession requires proof that "a defendant knowingly exercised a right to control the prohibited item, either directly or through another person." (*Sifuentes*, at p. 1417 [distinguishing "mere proximity to the weapon, standing alone"].) And "[c]onstructive possession exists where a defendant maintains *some* control or right to control contraband that is in the actual possession of another" even when that control is "exercised through the acts of an agent." (*People v. Morante* (1999) 20 Cal.4th 403, 417, italics added (*Morante*) [addressing constructive possession of a controlled substance].) "[M]ore than one person may possess the same" firearm. (*People v. Miranda* (2011) 192 Cal.App.4th 398, 410.) In *Miranda*, for example, the court found substantial evidence of defendant's constructive possession of a shotgun based solely on the defendant's presence with others in the car from which pieces of the shotgun were discarded, because "the jury reasonably could have inferred defendant and the others were aware of its presence" before it was tossed from the car. (*Id.* at pp. 410–411.)

There was no evidence that Lomeli was personally carrying a gun, but there was sufficient evidence from which the jury could infer that he was in constructive possession of the firearms used during the shooting, which were in the actual physical possession of Herena and Cruz. Beyond Whittington's opinion that a gang member would know his

fellow gang members were armed, Herena drew his gun when Lomeli said, "Pull it out"; this supports an inference that the two shared both a common understanding of what "it" was and a common understanding of its availability for Lomeli's purposes. To be sure, Herena's physical control over the weapon was greater. But the jury could reasonably infer that Lomeli had—and in fact exercised through Herena—"some control" over the weapon. (*Morante*, *supra*, 20 Cal.4th at p. 417; cf. *Sifuentes*, *supra*, 195 Cal.App.4th at p. 1417 [holding that defendant's presence in the room where a weapon was found underneath a mattress next to a codefendant was not sufficient to support defendant's constructive possession].) "A conviction may be supported by circumstantial evidence of constructive possession." (*People v. Taylor* (1984) 151 Cal.App.3d 432, 436 [sufficient evidence a defendant was in constructive possession of firearm where defendant was the driver and the gun was thrown out of passenger side].) Although Lomeli was free to argue contrary inferences, the availability of those inferences does not defeat the sufficiency of evidence to support the inference that he constructively possessed the firearms.

Lomeli's challenge to the sufficiency of evidence supporting his remaining conviction for assault with a deadly weapon derives from his claim that there is no substantial evidence that he knew his codefendants were armed. So our conclusion that substantial evidence supports his constructive possession of the murder weapons requires us to reject his related claim as to the assault on Perez.

## G.   *Cumulative Error*

The defendants all contend that even if the errors in this case were not individually prejudicial, reversal is required because the cumulative effect of the errors was prejudicial. "In theory, the aggregate prejudice from several different errors occurring at trial could require reversal even if no single error was prejudicial by itself." (*In re Reno* (2012) 55 Cal.4th 428, 483.) Here, we have found that the trial court erred in excluding some of Andres's prior statements. We have also assumed error from the trial court's

44

admission of hearsay from a passerby about Lomeli's prior assault with a deadly weapon. Even if we consider the error and assumed error together, we do not find that they "create[] a negative synergistic effect, rendering the degree of overall unfairness to defendant more than that flowing from the sum of the individual errors." (*People v. Hill* (1998) 17 Cal.4th 800, 847.) Accordingly, we find no merit in the defendants' claim of cumulative error.

## H. *Sentencing Issues and Fines and Fees*

All three defendants raise multiple arguments about sentencing, including victim restitution, and the trial court's imposition of fines and fees, which we need not reach. Due to our reversal of all three defendants' substantive gang convictions and gang enhancements, defendants are all entitled to a full resentencing and may raise or renew their arguments about sentencing and fines and fees at that time. (*People v. Buycks* (2018) 5 Cal.5th 857, 893 ["when part of a sentence is stricken on review, on remand for resentencing 'a full resentencing as to all counts is appropriate, so the trial court can exercise its sentencing discretion in light of the changed circumstances' "]; see *People v. Petronella* (2013) 218 Cal.App.4th 945, 968 [restitution hearings held under § 1202.4 are sentencing hearings].)

## III. DISPOSITION

As to defendants Abel Joseph Herena, Aaron Jovani Lomeli, and Juan Valdovinos Cruz, the convictions for the substantive gang convictions and the true findings on the gang enhancements are reversed.

As to defendants Lomeli and Cruz, their convictions for murder and the true findings on any associated special circumstances or enhancements are reversed.

45

_____
LIE, J.

WE CONCUR:


_____
GROVER, Acting P. J.


_____
BROMBERG, J.


*People v. Herena et al.*
H042741